UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEMETREE WYNN,                    )
                                  )
              *Plaintiff*,         )
                                  )
        vs.                       )          No. 1:20-cv-1638-JMS-MJD
                                  )
CITY OF INDIANAPOLIS,             )
RANDAL TAYLOR, KENDALE ADAMS, and )
DE'JOURE MARQUISE MERCER,         )
                                  )
              *Defendants*.        )

## ORDER

On May 6, 2020, Dreasjon Ire Reed was pursued, tased, and fatally shot by Officer De'Joure Marquise Mercer of the Indianapolis Metropolitan Police Department ("IMPD"). Plaintiff Demetree Wynn, individually, as the mother of Mr. Reed, and as the personal representative of the Estate of Mr. Reed, filed this action seeking redress in connection with her son's death. Presently pending before the Court is a Motion for Summary Judgment filed by Defendants the City of Indianapolis ("the City"), Officer Mercer, IMPD Chief of Police Randal Taylor, and IMPD Deputy Chief of Police Kendale Adams. [Filing No. 79.] The motion has been fully briefed and is ripe for the Court's decision.

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary

1

judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017)

(quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the

summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."

*Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could

return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

The Court views the record in the light most favorable to the non-moving party and draws all

reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907

(7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must

be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible

evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number

or otherwise similarly specify where the relevant information can be found in the supporting

evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record"

for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73

(7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).

Where a party fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary

judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts

that are material to the decision.  A disputed fact is material if it might affect the outcome of the

suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).

In other words, while there may be facts that are in dispute, summary judgment is appropriate if

those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th

Cir. 2005).   Fact disputes that are irrelevant to the legal question will not be considered.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS[1]

The following factual background is set forth pursuant to the standards outlined above.

The facts stated are not necessarily objectively true, but as the summary judgment standard

requires, the undisputed facts and the disputed evidence are presented and considered in the light

most favorable to "the party against whom the motion under consideration is made."  *Premcor*

*USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).  However, "[w]hen

the evidence includes a videotape of the relevant events, the Court should not adopt the

---

[1] The parties failed to comply with the Court's Practices and Procedures for submitting evidence and citing to such evidence in their briefs.  As the Practices and Procedures state, "[i]t is critically important that exhibits be filed *before* supporting briefs so that citations in supporting briefs are to the docket numbers of the previously-filed exhibits." [Filing No. 38 at 3 (emphasis added).]  Further, the Practices and Procedures require that parties "cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document," and then sets forth the proper format for citations.  [Filing No. 38 at 4.]  Instead of following these rules, both parties filed their exhibits contemporaneously with their briefs, which left them to guess what the docket numbers of each exhibit would be.  They both guessed wrong, and therefore neither their designations of evidence nor the citations within their briefs use filing numbers that match the numbers stamped on the exhibits by the Court's electronic filing system.  [*See, e.g.*, Filing No. 80-1 at 1 (Defendants listing "Exhibit 2: Dkt. 80-2 – Adams Affidavit," when Deputy Chief Adams' Affidavit is docketed as Filing No. 80-5); Filing No. 83-1 at 1 (Ms. Wynn listing "Exhibit 1: Dkt. 83-1 – Deposition of Demetree Wynn," when her deposition is docketed as Filing No. 83-2).]  In addition, Ms. Wynn in her briefing often uses citations such as "Wynn Aff ¶ 12" or "Mercer Depo. P. 38," without referencing filing numbers at all.  These issues have made the Court's review of the record evidence unnecessarily difficult and cumbersome.  Counsel is cautioned to comply with the Court's Practices and Procedures in this and other cases going forward—compliance with these rules is not optional.

nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).

**A.  IMPD's Relevant Policies**

IMPD develops and maintains formal written directives to provide officers with a clear understanding of the constraints and expectations governing the performance of their duties. [Filing No. 80-7 at 2; Filing No. 80-7 at 17.]  All IMPD officers are required to read, understand, and follow all of IMPD's directives.  [Filing No. 80-5 at 2; Filing No. 80-7 at 2.]  Officer Mercer and Deputy Chief Adams specifically acknowledge that they read and understood all relevant IMPD policies prior to encountering Mr. Reed on May 6, 2020.  [Filing No. 80-3 at 1; Filing No. 80-5 at 2.]

*1.  The Vehicle Pursuit Policy*

IMPD's General Order 4.12, titled "Vehicle Pursuits," ("the Vehicle Pursuit Policy") establishes guidelines for high-speed vehicle pursuits.  [Filing No. 80-4 at 17; *see also* Filing No. 80-5 at 3.]  The Vehicle Pursuit Policy states: "The authority of a law enforcement officer to engage in pursuit is inherent in the officer's duty to apprehend persons who have committed, or are committing a law violation.  The authority to pursue law violators provides [IMPD] an opportunity to deter crime and protect the citizens of Indianapolis and Marion County." [Filing No. 80-4 at 17.]  "The decision to engage in a pursuit must be considered a very serious matter," and "[o]fficers must consider not only themselves, but the general public and occupants of the fleeing vehicle, as well." [Filing No. 80-4 at 17.]

In relevant part, the Vehicle Pursuit Policy provides:

Pursuit driving shall only be permitted in the following circumstances:

1. On sight pursuit of a person who has committed, is committing, or is about to commit a felony;

2.  On sight pursuit of a traffic offense or misdemeanor violator when the violation has been witnessed by the pursuing member; and

3.  When ordered by a ranking officer to assist the primary pursuit vehicle.

[Filing No. 80-4 at 18.]  Before initiating and during the course of a pursuit, officers are directed to consider the following factors: (1) seriousness of the offense; (2) knowledge of the identity of the pursued suspect; (3) other occupants of the vehicle; (4) weather and lighting conditions; (5) road conditions; (6) density of vehicular and pedestrian traffic; (7) locality of the pursuit; (8) familiarity with the area; (9) nature of the pursuit, including whether the suspect vehicle is driving erratically or recklessly; and (10) the vehicle's speed.  [Filing No. 80-4 at 18.]  A pursuing officer or a supervisor may terminate a pursuit based on consideration of these factors if the officer or supervisor, in their experience and judgment, determines that "the risk factors are too great to continue the pursuit."  [Filing No. 80-4 at 23.]

The Vehicle Pursuit Policy further requires that all vehicles engaged in a pursuit must turn on their emergency lights and sirens.  [Filing No. 80-4 at 18.]  Officers in unmarked police vehicles equipped with sirens and lights may initiate a pursuit, but must "immediately relinquish control of the pursuit" to marked police vehicles "as soon as possible."  [Filing No. 80-4 at 18.]  At any given time, only three department vehicles may "operate under pursuit conditions in an attempt to stop a fleeing vehicle," unless a supervisor orders otherwise.  [Filing No. 80-4 at 19.]  Upon termination of a pursuit, all pursing officers "will cease emergency operation" of their vehicles.  [Filing No. 80-4 at 20.]

### 2. The Use of Force Policy

IMPD's General Order 1.30, titled "Use of Force – Principles," ("the Use of Force Policy") "provides [IMPD] officers with guidelines for the reasonable use of force."  [Filing No. 80-4 at 9.]  The Use of Force Policy "authorizes reasonable force to accomplish lawful

objectives," and provides that "[o]fficers may use reasonable force if the officer reasonably believes the force is necessary given the totality of circumstances." [Filing No. 80-4 at 9.]

Regarding the use of an electronic control device ("ECD"), also known as a taser,[2] the Use of Force Policy states that, "[e]very application of an ECD is a separate use of force requiring independent justification." [Filing No. 80-4 at 12.]  Further, "[t]he act of fleeing, without other factors involved, does not justify the use of an ECD." [Filing No. 80-4 at 12.]  An officer using an ECD "shall warn the subject and other officers at the scene of the intended use, should the subject not submit to lawful authority, if feasible." [Filing No. 80-4 at 12.]

Under the Use of Force Policy, "the use of a firearm is expressly considered deadly force." [Filing No. 80-4 at 12.]  Regarding deadly force, the Use of Force Policy states in relevant part:

> Officers may use deadly force only if the officer:
>
> A. Reasonably believes that the force is necessary to prevent the commission of a forcible felony; or
>
> B. Has probable cause to believe that the deadly force is necessary to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or [a] third person; and
>
> C. Has given a warning, if feasible, to the person against whom the deadly force is to be used.

[Filing No. 80-4 at 9 (emphasis original).]

Pursuant to the Use of Force Policy, "[m]edical assistance shall be obtained as soon as practical for any person who, as a result of an officer's use of force, has sustained visible injury or serious bodily injury, or who has expressed a complaint of injury or continuing pain." [Filing No. 80-4 at 9.]  "Following ECD deployment, the subject should be carefully observed for signs

---

[2] The Court uses the terms "ECD" and "taser" interchangeably in this Order.

of distress," and "[s]hould the subject exhibit signs of distress[,] he/she should be provided with immediate medical evaluation." [Filing No. 80-4 at 10.]

### B. Officer Mercer's Training History

Officer Mercer began working for IMPD in 2015. [Filing No. 80-2 at 1.] At that time, he completed a state-mandated, 26-week basic law enforcement officer training at the IMPD Academy ("Basic Academy Training"), where he "learned how state and federal law governs the authority that [he has] when working in a law enforcement capacity." [Filing No. 80-2 at 1; Filing No. 80-9 at 9.] His Basic Academy Training included, among other things, training on the use of firearms and tasers, vehicle pursuits, foot pursuits, body leveraging techniques, and using force generally. [Filing No. 80-9 at 10-13; Filing No. 80-9 at 23.] Following Basic Academy Training, Officer Mercer completed four to five months of field training, during which he was partnered with more experienced officers who showed him "how to police and be the police in a more practical scene or scenario that's outside the protection of the academy building." [Filing No. 80-9 at 12.]

Officer Mercer's training record shows that, in addition to his Basic Academy Training and field training, he completed several subsequent courses relating to the use of force. [Filing No. 80-4 at 3-5.] His courses also included topics such as ethics in law enforcement, various firearms trainings, and vehicle pursuits. [Filing No. 80-4 at 3-5.] However, after Basic Academy Training and field training, Officer Mercer did not receive any additional training on conducting foot pursuits. [Filing No. 80-9 at 12; Filing No. 83-11 at 9-11.]

During his time with the IMPD, Officer Mercer has deployed his taser at least five times. [Filing No. 80-9 at 14-15.] Two of those incidents resulted in citizens filing complaints against Officer Mercer, but in both instances, he was deemed to have not committed any wrongdoing.

[Filing No. 80-9 at 16-17.]  Prior to May 6, 2020, Officer Mercer discharged his firearm on one occasion, shooting and killing a stray dog that was "coming towards [him] and the citizen that called [IMPD]" about a dog being attacked by three other dogs.  [Filing No. 80-9 at 16.]

### C.  The May 6, 2020 Incident

#### 1.  *Initial Encounter and Vehicle Pursuit by Deputy Chief Adams and Chief Taylor*

On May 6, 2020, Deputy Chief Adams was on his way home from work, driving northbound on Interstate 65 in an unmarked Dodge Charger, when he looked in his rearview mirror and "observed a vehicle approaching at a high rate of speed," which is "not necessarily uncommon."  [Filing No. 80-5 at 2; Filing No. 80-8 at 13-14.]  Chief Taylor, who lives in the same general vicinity as Deputy Chief Adams and drives essentially the same route home, was also driving northbound on Interstate 65 in a separate unmarked Dodge Charger, not far ahead of Deputy Chief Adams.  [Filing No. 80-8 at 13; Filing No. 83-4 at 14-16.]  Although the speed limit on this portion of Interstate 65 is 55 miles per hour, Deputy Chief Adams was driving approximately 72 miles per hour, and the vehicle that he observed was traveling fast enough to pass him.  [Filing No. 80-8 at 14.]  This vehicle was later determined to be driven by Mr. Reed. [Filing No. 80-5 at 3.]

Deputy Chief Adams saw Mr. Reed's vehicle "make an abrupt lane change to the right," forcing another vehicle on the highway "to make a sudden movement to avoid [Mr.] Reed's vehicle."  [Filing No. 80-5 at 2-3.]  Deputy Chief Adams was unsure if Mr. Reed's vehicle struck the other vehicle.  [Filing No. 80-5 at 3.]  Deputy Chief Adams pulled his Charger behind Mr. Reed's vehicle, and both vehicles were traveling approximately 90 miles per hour.  [Filing No. 80-8 at 13.]  Mr. Reed did not slow down, so Deputy Chief Adams activated his emergency lights and siren to conduct a traffic stop of Mr. Reed for reckless driving.  [Filing No. 80-5 at 3;

Filing No. 80-8 at 13.]  Mr. Reed did not stop, so Deputy Chief Adams continued to pursue Mr. Reed's vehicle.  [Filing No. 80-5 at 3.]

At this time, Chief Taylor, who had observed Deputy Chief Adams' attempt to stop Mr. Reed, announced over the radio that he and Deputy Chief Adams were in pursuit of a vehicle. [Filing No. 80-8 at 14.]  Mr. Reed exited the interstate with Deputy Chief Adams and Chief Taylor pursuing him.  [Filing No. 83-4 at 16.]  Chief Taylor continued to "call the pursuit" over the radio until marked police units took over the pursuit.  [Filing No. 83-4 at 16-17.]  When marked police units took over, both Chief Taylor and Deputy Chief Adams dropped out of the pursuit.  [Filing No. 80-5 at 4; Filing No. 83-4 at 16-17.]  After dropping out of the pursuit, Chief Taylor eventually lost sight of Mr. Reed and the marked units pursuing him, but he continued to monitor the pursuit on the radio.  [Filing No. 83-4 at 20.]  Deputy Chief Adams also continued to listen to the radio, but returned to the interstate to "check on the car that [he] thought may have hit the guardrail or may have even hit another car" as a result of Mr. Reed's driving.  [Filing No. 80-8 at 14; *see also* Filing No. 80-5 at 4.]  Deputy Chief Adams did not locate any vehicles that had been struck or needed assistance.  [Filing No. 80-5 at 4.]  Neither Deputy Chief Adams nor Chief Taylor were present when the subsequent foot pursuit or shooting occurred.  [Filing No. 80-5 at 4; Filing No. 80-6 at 3.]

2.   *Officer Mercer's Vehicle Pursuit, Foot Pursuit, ECD Deployment, and Shooting*

Officer Mercer was on patrol in a marked police car near the intersection of 52nd Street and Lafayette Road when he heard about the vehicle pursuit over the radio.  [Filing No. 80-9 at 26.]  Officer Mercer saw Mr. Reed's vehicle near 56th Street and Lafayette Road and began to pursue Mr. Reed along with other officers.  [Filing No. 80-9 at 27; Filing No. 80-9 at 54.]  Shortly thereafter, Officer Mercer heard over the radio that the pursuit was being terminated.

[Filing No. 80-9 at 26.]  When a vehicle pursuit is terminated, all pursuing officers are supposed to turn off their lights and sirens and "[m]aintain legal traffic conditions."  [Filing No. 83-12 at 22; *see also* Filing No. 83-13 at 9-10 ("So, when a pursuit is terminated, the pursuing officers shut their lights and sirens off and stop driving in the pursuit.  So, the[y] stop exceeding the posted speed limit.  They stop running through red lights.  They stop pursuing.").]

Upon hearing that the pursuit was officially terminated, Officer Mercer turned off his lights and emergency equipment and "slowed down," but he continued to follow Mr. Reed "from a distance."  [Filing No. 80-9 at 26-27.]  Officer Mercer observed Mr. Reed approach the intersection of 62nd Street and Michigan Road, pull into the parking lot of a business called Ace Lock & Key, stop his vehicle behind the building, and flee on foot.  [Filing No. 80-9 at 27-28; *see also* Press Conference Video[3] at 4:40-5:08.]  Officer Mercer also pulled into the parking lot of Ace Lock & Key, exited his vehicle, and began to pursue Mr. Reed on foot.  [Filing No. 80-9 at 27-28; *see also* Press Conference Video at 4:40-5:08; Ace Security Video[4] at 0:00-0:25.]

At the time, Mr. Reed was wearing shorts and sneakers but was not wearing a shirt.  [Ace Security Video at 0:06-0:012.]  He was carrying a white t-shirt in his left hand.  [Filing No. 80-9 at 28; Ace Security Video at 0:08-0:11.]  He was also carrying two cell phones, one of which was recording video and streaming it live on Facebook.  [*See* Press Conference Video at 3:05-3:10; Press Conference Video at 18:50-18:58.]

---

[3] "Press Conference Video" refers to Ms. Wynn's Exhibit 22, which is a recording of a press conference held by the Indiana State Police on November 10, 2020.  The Press Conference Video is just under 36 minutes long and contains, among other things, video excerpts and still images from: (1) Mr. Reed's cell phone, which he used to record the May 6, 2020 incident and stream it live on Facebook; (2) security cameras on the Ace Lock & Key building; and (3) a security camera at the Indianapolis Public Library.

[4] "Ace Security Video" refers to Ms. Wynn's Exhibit 14, which is a 25-second video captured by a security camera at Ace Lock & Key.

a.  Officer Mercer's Account of the Foot Pursuit, ECD, and Shooting

Officer Mercer chased Mr. Reed across Michigan Road toward the Indianapolis Public Library.  [Filing No. 80-9 at 28; *see also* Press Conference Video at 2:45-3:01.]  Officer Mercer stated that he could see a t-shirt covering Mr. Reed's left hand, but did not know whether there were other items in his left hand, and he could not see Mr. Reed's right hand.  [Filing No. 80-9 at 28-29; Filing No. 80-9 at 54.]  Officer Mercer told Mr. Reed to stop "a couple of times."  [Filing No. 80-9 at 29; *see also* Filing No. 80-9 at 50.]  According to Officer Mercer, as he was pursuing Mr. Reed, Mr. Reed stumbled but did not fall down.  [Filing No. 80-9 at 29.]  At that time, Officer Mercer had not seen any gun on Mr. Reed.  [Filing No. 80-9 at 32.]

As Officer Mercer continued to pursue Mr. Reed, Officer Mercer saw Mr. Reed touching his waistband.  [Filing No. 80-9 at 54.]  Specifically, Officer Mercer stated:

> Mr. Reed was running, and he was concealing his hands in his waistband, and I could see his elbow as if he was holding something in his waistband.  It gave me the belief that he was likely armed with something, a weapon, and based on my training and experience, that's where suspects often conceal their weapons is their front waistband.  That was the only area on his person I was unable to see.

[Filing No. 80-9 at 41.]  Officer Mercer saw "what [he] recognize[d] to be the movement of [Mr. Reed's] hands consistent with concealing a firearm or getting ready to draw a firearm," and that is when Officer Mercer decided to deploy his ECD.  [Filing No. 80-9 at 55.]  According to Officer Mercer, Mr. Reed had one or both of his hands near his waistband at the time he was tased.  [Filing No. 80-9 at 55.]  Officer Mercer did not warn Mr. Reed that he was about to use his ECD because he did not believe it was feasible to do so.  [Filing No. 80-9 at 42.]  Officer Mercer stated that he was "[a]t least five feet" away from Mr. Reed when the ECD was deployed. [Filing No. 80-9 at 56.]

Officer Mercer testified that he did not believe the taser had been "successful."  [Filing No. 80-9 at 35.]  According to Officer Mercer, after Mr. Reed was hit with the ECD, he fell to the ground and then retrieved a firearm with his right hand.  [Filing No. 80-9 at 37-38.]  Officer Mercer gave the following account of the ensuing events:

> [Mr. Reed] pulled his right elbow up consistent with what I recognize at that time to be as drawing a firearm.  As he's doing that, he is falling down to the ground. As he falls down to the ground on his frontal area, he immediately rolls over on his right side of his body with the gun still in his right hand.  He's going counterclockwise, and I recognize that he's trying to point the firearm at my direction.  So, in turn, I, too, go counterclockwise, and that's when he fires a shot. At that point, I begin firing, and the gunfight is there.

[Filing No. 80-9 at 55.]

> b.  Eyewitness Brian Massie's Account

Brian Massie was driving south on Michigan Road with his passenger, Bernard Parks, when he saw Officer Mercer approach "at a high speed with lights on" and pull into the Ace Lock & Key parking lot.  [Filing No. 83-15 at 8-10.]  Mr. Massie stopped his car and saw Officer Mercer exit his vehicle and pursue Mr. Reed.  [Filing No. 83-15 at 9-10.]  Mr. Massie saw that Mr. Reed was shirtless but was carrying a t-shirt in his left hand.  [Filing No. 83-15 at 19-20.] Mr. Massie described what he saw as follows:

> [Mr. Reed] crossed over Michigan Road, and he kind of like tripped in like a ravine, on a ravine once he got across to Michigan Road, which is the library area. He kind of like stumbled.  He continued to get up.
>
> I said, Bernard, [the cop's] about to get him.  He's about to get him. . . .  The cop was so close, he could have reached out and grabbed this kid or even clipped him.[5] . . .
>
> But I guess he proceeded to pull his taser out.  He tased him.  The kid like locked up, went over.  Then he pulled his gun out and started shooting him, shooting him basically like standing over him, like then shooting him.  As he was shooting him, he was stepping back.

---

[5] Mr. Massie clarified that by "clip him," he meant "trip him."  [Filing No. 83-15 at 11.]

12

[Filing No. 83-15 at 11.]

According to Mr. Massie, when Officer Mercer was pursuing Mr. Reed, he got within arm's length of Mr. Reed, close enough to grab him or tackle him. [Filing No. 83-15 at 14-15.] Mr. Massie testified that Officer Mercer was still that close to Mr. Reed when Officer Mercer deployed his ECD. [Filing No. 83-15 at 16.] Mr. Massie observed that as soon as Officer Mercer deployed his ECD, he "like simultaneously" pulled his firearm and began shooting Mr. Reed while standing over him, "basically almost like straddling his body." [Filing No. 83-15 at 16-17; see also Filing No. 83-15 at 26 ("It was simultaneously. I mean, it was like he shot the taser, and he pulled the gun out. . . . It was quick. I mean seconds. I mean, it was quick.").] Mr. Massie did not see Mr. Reed move at all once he was tased and fell to the ground. [Filing No. 83-15 at 20.] Mr. Massie did not see Mr. Reed draw or fire a weapon. [Filing No. 85-13 at 26; see also Filing No. 83-15 at 28 ("Dreasjon never had a gun that I seen. He never pointed nothing at Officer Mercer.").]

c.   Eyewitness Kelly Pugh's Account

Kelly Pugh was driving south on Michigan Road with her passenger, Damon Dulin, when she heard police sirens and stopped near the intersection of Michigan Road and 62nd Street. [Filing No. 83-16 at 11.] She saw Officer Mercer pull into the Ace Lock & Key parking lot and noticed that his vehicle's sirens were on. [Filing No. 83-16 at 13-14.] Ms. Pugh then observed Officer Mercer chase Mr. Reed across Michigan Road toward the library. [Filing No. 83-16 at 14.] According to Ms. Pugh, Mr. Reed "started to slow down," and Officer Mercer caught up to him and "got in close range to shoot the stun gun." [Filing No. 83-16 at 17.] She estimates that Officer Mercer was within four to six feet of Mr. Reed when he deployed his ECD. [Filing No. 83-16 at 19-20.] She testified that after Mr. Reed was tased, he was "shaking to the ground," and

Officer Mercer immediately drew his firearm and shot Mr. Reed.  [Filing No. 83-16 at 20-21; Filing No. 83-16 at 21 ("It was simultaneously.  As soon as he fell to the ground the gun came out and he was shot five times.").]  Ms. Pugh never saw Mr. Reed holding or firing a gun. [Filing No. 83-16 at 23.]

d.  Eyewitness Damon Dulin's Account

Damon Dulin was a passenger in Ms. Pugh's vehicle.  [Filing No. 83-17 at 10.]  As they approached the intersection of 62nd Street and Michigan Road, he saw "a cop car moving at a fast rate of speed down 62nd" before turning into the parking lot of the Ace Lock & Key.  [Filing No. 83-17 at 12.]  Mr. Dulin saw Officer Mercer chase Mr. Reed on foot across the street into a field near the library.  [Filing No. 83-17 at 15-16.]  According to Mr. Dulin, once Officer Mercer and Mr. Reed crossed the street, Officer Mercer "closed in on" Mr. Reed and was less than 12 feet away from Mr. Reed but "[f]urther than arm's reach" away.  [Filing No. 83-17 at 17.]  Mr. Dulin testified that Officer Mercer deployed his ECD and Mr. Reed "fell like a tree," meaning he "got hit and immediately fell, legs kind of flailing a little bit."  [Filing No. 83-17 at 18-19.]  Mr. Dulin thought that it looked like Mr. Reed was having a seizure because he was convulsing. [Filing No. 83-17 at 31-32.]  At this point, Officer Mercer was within a couple of feet of Mr. Reed.  [Filing No. 83-17 at 19.]

According to Mr. Dulin, the time between when the ECD was deployed and when Officer Mercer first fired his gun was less than 30 seconds.  [Filing No. 83-17 at 32.]  Officer Mercer was standing within a couple of feet of Mr. Reed, pointing his gun downward.  [Filing No. 83-17 at 19-20.]  Mr. Dulin said Officer Mercer was stationary, "standing right there, just unloading." [Filing No. 83-17 at 21.]  Mr. Dulin never saw Mr. Reed holding or brandishing a gun.  [Filing

No. 83-17 at 27; Filing No. 83-17 at 32-33.]  He did not see Mr. Reed moving his hands towards his waistband or trying to pull anything from his pockets.  [Filing No. 83-17 at 34.]

### 3.  IMPD Investigation and Findings

IMPD Officer Andre Biggers arrived at the scene shortly after the shooting, and saw that Mr. Reed appeared to be deceased.  [Filing No. 83-12 at 24-25.]  According to Officer Biggers, he saw a firearm in Mr. Reed's right hand, and he moved the firearm in the interest of officer safety.  [Filing No. 83-12 at 26-29.]  Mr. Reed was licensed to carry a firearm.  [Filing No. 83-2 at 43.]

A special prosecutor was appointed, and she requested that the Indiana State Police take over for IMPD in investigating the circumstances surrounding the shooting.  [Filing No. 83-20 at 14-16.]  Lieutenant Jeffrey Hearon of the Indiana State Police was one of the investigators who worked on the case.  [Filing No. 83-20 at 10-15.]  At a press conference, Lt. Hearon stated that the investigative team was unable to determine who shot first, although the team was able to determine that Mr. Reed shot his firearm twice.  [Press Conference Video at 22:18-22:55; Press Conference Video at 25:05-25:45; *see also* Filing No. 83-20 at 25-26.]  Officer Mercer fired his weapon 13 times.  [Press Conference Video at 26:15-26:28.]

A grand jury was convened to consider whether Officer Mercer should be indicted on criminal charges, but ultimately the grand jury did not return an indictment.  [Filing No. 80-13 at 1; Filing No. 80-14 at 1; Filing No. 83-20 at 15-16.]

### D.  This Lawsuit

Ms. Wynn filed this lawsuit individually, as the mother of Mr. Reed, and as the personal representative of the Estate of Mr. Reed, on June 16, 2020.  [Filing No. 1.]  Upon Defendants' Motion to Dismiss, the Court dismissed several claims and several defendants.  [Filing No. 31.]

The following claims remain pending: (1) a Fourth Amendment excessive force claim against Officer Mercer, pursuant to 42 U.S.C. § 1983; (2) a claim for denial of medical care against Officer Mercer, pursuant to § 1983; (3) claims against the City for excessive force and failure to train, pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); (4) a state law battery claim against Officer Mercer and the City; (5) a state law wrongful death claim against the City, Chief Taylor, and Deputy Chief Adams; and (6) a state law negligent infliction of emotional distress ("NIED") claim against the City, Chief Taylor, and Deputy Chief Adams. [*See* Filing No. 31 at 23.]   On October 8, 2021, Defendants filed their Motion for Summary Judgment, seeking judgment in their favor on all claims.  [Filing No. 79.]  That motion is fully briefed, [Filing No. 80; Filing No. 83; Filing No. 90; Filing No. 91], and ripe for the Court's decision.

### III.
#### DISCUSSION

At the outset, the Court notes that Defendants, after reviewing Ms. Wynn's response to their Motion for Summary Judgment and her designated evidence, have withdrawn their request for summary judgment on several claims.  Specifically, Defendants acknowledge—and the Court agrees—that Ms. Wynn has put forward sufficient evidence to create genuine issues of material fact concerning the circumstances under which Officer Mercer shot Mr. Reed.  As a result, Defendants acknowledge that summary judgment is not appropriate on claims relating directly to the shooting itself.  The following claims therefore will proceed to trial and will not be addressed further in this Order: (1) the Fourth Amendment excessive force claim against Officer Mercer related to the shooting; (2) the state law battery claim against Officer Mercer; (3) the state law battery claim against the City; and (4) the state law NIED claim against the City.  The Court will address Ms. Wynn's remaining claims in turn.

16

**A. Federal Excessive Force Claim Against Officer Mercer Related to the Use of an ECD/Taser**

*1. Whether the Claim Has Been Properly Preserved*

In their initial brief in support of their Motion for Summary Judgment, Defendants did not discuss an excessive force claim related to the use of an ECD, and instead only presented arguments pertaining to Ms. Wynn's excessive force claim related to the shooting. [*See* Filing No. 80 at 16-19.]   In her response, however, Ms. Wynn argued that Officer Mercer used excessive force in two separate instances: (1) when he tased Mr. Reed; and (2) when he shot Mr. Reed with a firearm. [*See* Filing No. 83 at 23-28.]   In their reply, Defendants argue that because Ms. Wynn's Statement of Claims did not specifically list a separate excessive force claim related to the use of an ECD, she has abandoned or waived any such claim. [Filing No. 91 at 2-4.]

The Case Management Plan provides that "the party with the burden of proof shall file a statement of the claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based," and that "[a] party's failure to include in the party's statement of claims or defenses a claim or defense upon which the filing party has the burden of proof may result in the waiver of the omitted claim or defense." [Filing No. 24 at 6]; *see also Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (affirming this Court's conclusion that a claim not included in the plaintiff's Statement of Claims was abandoned).   As this Court has previously observed, "the requirement that parties file statements of their claims and defenses is intended to clarify and focus the issues for summary judgment and for trial, in order to avoid wasting time on issues that will not be pursued and ensure that the claims that are going forward can be addressed and disposed of in the most efficient manner possible." *Kilbourne v. City of Indianapolis*, 2020 WL 2558147, at *10 (S.D. Ind. May 20, 2020).   The requirement also "represents the Court's effort to prevent parties from presenting 'moving targets'

to unfairly avoid summary judgment," and the Court has noted that "[t]he Statement of Claims should provide each party with a clear idea of the other's legal theories, enabling the parties to directly address one another's positions." *Harris v. Carrier Corp.*, 2017 WL 4037658, at *2 (S.D. Ind. Sept. 13, 2017).

Ms. Wynn's Statement of Claims outlines her version of the basic facts underlying this case, including that "Officer Mercer first shot [Mr.] Reed with his Electronic Control Device (ECD) or taser gun." [Filing No. 75 at 1.] She defines the excessive force claim as follows: "Officer Mercer . . . used excessive force when he shot and killed Mr. Reed on May 6, 202[0]." [Filing No. 75 at 3.] However, in that same paragraph, she again notes that "Officer Mercer first tased Mr. Reed who fell to the ground and began to convulse." [Filing No. 75 at 3.] In addition, with respect to her state law battery claim against Officer Mercer, she states: "Officer Mercer committed assault and battery on the person of Mr. Reed when on May 6, 202[0], Officer Mercer unjustifiably and *in an excessive show of force shot Mr. Reed with his ECD* and subsequently shot Mr. Reed with at least fourteen (14) bullets from his service weapon as Mr. Reed laid convulsing from the previous electric shock from Officer's Mercer's ECD." [Filing No. 75 at 5 (emphasis added).]

The Court acknowledges that the Statement of Claims is not precisely drafted and is not a model of clarity when it comes to defining the claims of excessive force.[6] The Court further

---

[6] Further, the date of the incident is repeatedly misstated throughout the Statement of Claims. It is clear that this is a scrivener's error, but it nonetheless shows counsel's lack of attention to detail. And this is not the only example of imprecise drafting that has caused confusion in this case. [*See* Filing No. 31 at 4-5 (Court's October 26, 2020 order on Defendant's Motion to Dismiss, stating: "At the outset, the Court notes that Ms. Wynn does not specify [in the Complaint] against which Defendant(s) each claim is asserted and seeks judgment 'against Defendants'—presumably, all Defendants—with respect to each count. Ms. Wynn also uses vague phrases referencing the conduct of 'Officer Mercer and others' or 'the Defendants' misconduct.' This practice is imprecise and unhelpful. Nevertheless, the Court has done its best

acknowledges that its own prior Order may have contributed to the lack of clarity in whether two excessive force claims or just one remain for trial.  [*See* Filing No. 31 at 23 (stating that a singular "§ 1983 claim for excessive force against Officer Mercer individually and against the City under *Monell*" shall proceed); *but see* Filing No. 31 at 10 ("Here, although Ms. Wynn asserts her claim for excessive force against all Defendants, the only act of force she refers to in the Complaint is the fatal shooting of Mr. Reed, *and potentially the use of an ECD*, by Officer Mercer.") (emphasis added).]   But the fundamental principles underlying the Statement of Claims requirement are notice, fairness, and efficiency, and it cannot reasonably be said that any of these principles are offended by the conclusion that Ms. Wynn has preserved two separate claims of excessive force based on both the use of an ECD and the shooting with a firearm.  In the Complaint and throughout this lawsuit, Ms. Wynn has maintained the position that Officer Mercer's use of an ECD was unlawful, and Defendants have been on notice of that position.  It is not now unfair to require Defendants to defend against that position, especially where Ms. Wynn has clearly preserved her battery claim relating to the ECD, which is essentially a state law corollary to the excessive force claim.  The events underlying the entirety of the encounter between Mr. Reed and the police have been the subject of discovery up to this point, and Defendants are in no way prejudiced by having to make arguments about those events as they relate to a federal constitutional claim of excessive force.[7]  Accordingly, the Court will consider

---

to determine which claims are lodged against which Defendants and, where appropriate, considers the claim to be asserted against all Defendants.") (internal citation omitted).]  Counsel is reminded that the pleadings and the Statement of Claims are vitally important documents, and he must take care to draft them properly.  This is true in all cases, but especially in a case such as this one, which involves not only the tragic loss of a life but also related matters of great social significance.

[7] To the extent that Defendants were unsure as to the precise nature of Ms. Wynn's excessive force claims, they could have sought clarification, either from opposing counsel informally, or by filing a motion for a more definite statement.

whether summary judgment on Ms. Wynn's excessive force claim relating to the use of the ECD is appropriate.[8]

### 2.  Whether Summary Judgment is Appropriate

In her response to Defendants' Motion for Summary Judgment, Ms. Wynn argues that Officer Mercer's use of the ECD constituted excessive force.  [Filing No. 83 at 24-26.]  She notes that the Use of Force Policy specifies that the use of a taser is a separate act of force requiring independent justification, and that the act of fleeing by itself is insufficient to justify the use of an ECD.  [Filing No. 83 at 24.]

In reply, Defendants argue that Officer Mercer is entitled to qualified immunity because Ms. Wynn "has not demonstrated that the deployment of the taser in the manner used by Officer Mercer on May 6, 2020 violated a clearly established right."  [Filing No. 91 at 4.]  Defendants argue that Ms. Wynn has the burden of defeating a qualified immunity defense but has not pointed to any case that squarely governs Officer Mercer's conduct or would have put him on notice that deploying a taser violated Mr. Reed's constitutional rights.  [Filing No. 91 at 5-9.]

"A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right."  *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "As applied to a Fourth Amendment

---

[8] Regarding the excessive force claim based on the use of an ECD, Defendants also contend that Ms. Wynn failed to comply with Local Rule 56-1 to the extent that the portion of her brief concerning this claim "lacks citations to designated evidence to support any claims in this section."  [Filing No. 91 at 4.]  The Court notes that while the argument section of Ms. Wynn's brief relating to the use of the ECD does not contain citations to the record, [*see* Filing No. 83 at 24-26], that section merely recounts facts that were already set forth in Ms. Wynn's "Statement of Materials (sic) Facts in Dispute" section, which contains citations to the record, [*see* Filing No. 83 at 2-22].  Ms. Wynn's brief therefore complies with Local Rule 56-1.  In any event, Defendants' contention that her version of facts relevant to the ECD issue should be deemed admitted because they "have not been specifically controverted" is borderline absurd given the obvious and acknowledged factual disputes that remain in this case.

excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery*, 911 F.3d at 466 (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)).   The qualified immunity doctrine is an affirmative defense, and once the defense is raised, it becomes the plaintiff's burden to defeat it. *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citation omitted).

Whether qualified immunity applies is a two-step analysis, and courts must consider: (1) whether the facts shown by the plaintiff establish a violation of a constitutional right; and (2) if so, whether that constitutional right was clearly established at the time of the defendant's alleged misconduct.   *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).   However, the "order of inquiry is not rigid," and a court "may address the second question first if it simplifies the analysis."   *Dockery*, 911 F.3d at 466 (citations omitted).

"To show that a right is clearly established, the plaintiff must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'"   *Id.* (quoting *Al-Kidd*, 563 U.S. at 741).   "[C]learly established law should not be defined at a high level of generality," and instead "must be particularized to the facts of the case."   *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotations and citations omitted).   In the Fourth Amendment context, a finding that the right at issue was clearly established generally requires that there be "a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment."   *Id.*; *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.") (internal quotations and citation omitted).   Alternatively, "[a] plaintiff may also overcome an officer's

21

qualified immunity by showing that the conduct in question is 'so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.'" *Dockery*, 911 F.3d at 466-67 (quoting *Abbott*, 705 F.3d at 723-24).

The inquiry into whether an officer used excessive force in violation of the Fourth Amendment is governed by the Supreme Court's decisions in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989). *Strand v. Minchuk*, 910 F.3d 909, 914 (7th Cir. 2018). Under this standard, a court must consider the totality of the circumstances, including the severity of the crime at issue, the immediate threat the suspect posed to the safety of the police officer and others, "if the suspect actively resisted or attempted to evade arrest by flight," whether the individual was under arrest or suspected of committing a crime, whether the individual was armed, and whether the person was interfering or attempting to interfere with the officer's duties. *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021) (citing *Graham*, 490 U.S. at 396; *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The fundamental question is 'whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Smith*, 10 F.4th at 736 (quoting *Garner*, 471 U.S. at 8-9).

Ms. Wynn bears the burden of overcoming Defendants' qualified immunity defense by establishing that: (1) Officer Mercer violated the Fourth Amendment by using a taser on Mr. Reed; and (2) as of May 6, 2020, it was clearly established that an officer using a taser against a suspect in circumstances similar to those presented in this case violates the Fourth Amendment. The precise details of the circumstances under which Officer Mercer deployed his taser are disputed by the parties, and specifically the eyewitness accounts create a genuine issue of

material fact as to whether Officer Mercer had any reason to believe that Mr. Reed was armed at the time when he deployed his taser.  At this stage in the litigation, the standard of review requires that the Court view the facts in the light most favorable to Ms. Wynn, and therefore for purposes of this analysis only, the Court will assume that Officer Mercer had no reason to believe that Mr. Reed was armed at the time when the taser was deployed.  Nevertheless, Ms. Wynn has not identified any caselaw clearly establishing that using a taser on an apparently unarmed, fleeing suspect violates the Fourth Amendment.

In her briefing, Ms. Wynn points to *Sturm v. City of Indianapolis*, 2016 WL 2894434 (S.D. Ind. May 18, 2016).  [*See* Filing No. 83 at 25-26.]  However, the Seventh Circuit has "conclusively stated that district court opinions cannot clearly establish a constitutional right because they are not binding precedential authority."[9] *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1449 (2021) (citing *Mason-Funk v. City of Neenah*, 895 F.3d 504, 509 (7th Cir. 2018)).

Ms. Wynn also references *Abbott v. Sangamon Cty.*, 705 F.3d 706 (7th Cir. 2013), which was also relied upon by the *Sturm* Court.  [*See* Filing No. 83 at 25-26.]  *Abbott* involved excessive force claims brought by two separate plaintiffs, Travis Abbott and Cindy Abbott, relating to the use of a taser.  *See Abbott*, 705 F.3d at 709-12.  Travis was tased multiple times by law enforcement and argued that although the first deployment of the taser was justified, the subsequent deployments constituted excessive force because he was subdued by the first

---

[9] The Court also notes that Ms. Wynn did not discuss the facts of *Sturm* or meaningfully develop any argument as to why that case established that using a taser against a fleeing suspect violates the Fourth Amendment.  In fact, the *Sturm* Court accepted the plaintiff's contention that he was "simply walk[ing] away" and "not actively resisting arrest or attempting to evade arrest by flight" when he was tased, and concluded that "he was, at most, a passively resisting suspect." *Sturm*, 2016 WL 2894434, at *9-10.  *Sturm* therefore is factually distinguishable from the present case, where the undisputed evidence shows that Mr. Reed was attempting to evade arrest by flight.

deployment. *Id*. at 727. However, the Court concluded that Travis "admit[ed] that he continued fighting with [the officer] after the first application of the taser, so he was not subdued." *Id*. Recognizing that "[c]ourts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable," the Court determined that the officer had not violated clearly established law by using a taser several times until Travis was subdued. *Id*. at 727-29 (concluding that the officer was entitled to qualified immunity on Travis's excessive force claim).

Cindy was also tased more than once, and also did not challenge the first deployment of the taser, instead arguing that the second deployment was excessive because she was subdued by the first deployment. *Id*. at 729. The Court agreed that the second deployment of the taser constituted excessive force, noting that there was "absolutely no evidence that Cindy posed a threat to [the officer], herself, or anyone else, especially after the first tasing when she was lying on her back on the ground and not moving" and that "although she did not comply with [the officer's] order to turn over onto her stomach after the first tasing, she did not move and at most exhibited passive noncompliance and not active resistance." *Id*. at 730. The Court further concluded that the officer was not entitled to qualified immunity on Cindy's excessive force claim because "it was clearly established on [the date of the incident] that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over." *Id*. at 732. In so holding, the *Abbott* Court relied upon the "well-established" principles that "police officers [cannot] use significant force on nonresisting or passively resisting suspects" because

"only a minimal amount of force may be used on such arrestees," and that "police officers cannot continue to use force once a suspect is subdued." *Id.*[10]

Subsequently, in *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018), the Seventh Circuit, relying on *Abbott*, explained that there are "two guideposts in an excessive-force case" involving the use of a taser. "The first is that an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Dockery*, 911 F.3d at 467. Examples of active resistance include "kicking and flailing," "declining to follow instructions while acting in a belligerent manner," and "swatting an arresting officer's hands away while backpedaling." *Id.* (citations omitted). "The second guidepost is that an officer may not use significant force (like a Taser) against a 'nonresisting or passively resisting' subject." *Id.* (citation omitted). Examples of such suspects include "a 'docile and cooperative' suspect who posed no threat and 'did not resist arrest in any way'" and "a handcuffed, passive suspect." *Id.* (citations omitted).

One additional Seventh Circuit case concerning the use of a taser is instructive. In *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 859 (7th Cir. 2010), the plaintiff, Mr. Cyrus, was believed to be trespassing on private property when an officer confronted him and asked him to leave. Mr. Cyrus ignored the officer's request and made his way toward the house on the property, so the officer tased him, causing Mr. Cyrus to fall to the ground. *Id.* Mr. Cyrus "attempted to stand up but wobbled on his feet and fell back down to the ground," and the officer tased him again. *Id.* After the second shock, Mr. Cyrus "barrel-rolled four or five times down the driveway." *Id.*

---

[10] *Abbott* further recognizes that deploying a taser constitutes more than a *de minimis* use of force and is generally nonlethal but may result in significant pain to the person being tased. *See Abbott*, 705 F.3d at 726 (citing cases). Ms. Wynn cites *Abbott* and other cases recognizing these principles. [*See* Filing No. 83 at 25.] However, these principles are not disputed, and citing these cases does nothing to address whether using a taser against a fleeing suspect in circumstances similar to those presented in this case constitutes excessive force.

Mr. Cyrus was lying on the driveway with his hands underneath him and did not immediately comply with the officer's order to show his hands. *Id.* at 860. After unsuccessfully attempting to forcibly remove Mr. Cyrus' hands from underneath his body, the officer tased him several more times. *Id.* Mr. Cyrus ultimately stopped breathing and later died. *Id.*

The *Cyrus* Court concluded that there was conflicting evidence regarding the number of times the officer deployed his taser and the extent to which Mr. Cyrus resisted arrest. *Id.* at 862. Specifically, the Court acknowledged that although there was evidence that Mr. Cyrus disobeyed the officer's commands, "the parties dispute[d] whether [Mr.] Cyrus ran or merely walked toward the house after [the officer] told him he was on the wrong property," and "although [the officer] characterize[d] [Mr.] Cyrus's barrel-roll down the driveway as an attempt to flee, a jury might see it differently" and could "reasonably conclude that the barrel-roll was an involuntary reaction to the second Taser shock." *Id.* at 862-63. Accordingly, the Court reversed the district court's grant of summary judgment in favor of the officer on Mr. Cyrus' claim for excessive force because a reasonable jury might conclude that the force used was excessive. *Id.* at 863.

Based on the foregoing caselaw, it was clearly established as of May 6, 2020 that a police officer can generally use a taser against an actively resisting suspect, but not against a nonresisting or passively resisting suspect. However, Ms. Wynn has not pointed to a case—and the Court's own research has not located one—that clearly establishes that Mr. Reed fleeing on foot constitutes passive rather than active resistance. In fact, the cases cited above suggest that attempting to evade arrest by flight, and specifically by running, may justify the use of force. *See Smith,* 10 F.4th at 736; *Cyrus,* 624 F.3d at 862-63. Although, as Ms. Wynn points out, IMPD's Use of Force Policy prohibits the use of a taser against a suspect who is merely fleeing and requires that an officer should warn a suspect before tasing him if feasible, a violation of

IMPD policy does not establish a violation of the Fourth Amendment.  *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (recognizing that § 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices"); *Soller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996) (concluding that police "policies were simply not relevant to the issue of the reasonableness" under the Fourth Amendment).  Accordingly, the Court concludes that Ms. Wynn has failed to meet her burden of demonstrating that it was clearly established as of May 6, 2020 that an officer violates the Fourth Amendment by deploying a taser against a suspect under the circumstances in which Officer Mercer deployed his taser against Mr. Reed.  Officer Mercer is therefore entitled to qualified immunity on Ms. Wynn's excessive force claim related to the use of the ECD.  Defendants' Motion for Summary Judgment is **GRANTED** to the extent Officer Mercer seeks judgment in his favor on this claim.

### B.  Federal Inadequate Medical Care Claim Against Officer Mercer

Defendants argue that Ms. Wynn cannot prevail on her claim for inadequate medical care because the undisputed evidence shows that as soon as Officer Mercer shot Mr. Reed, he requested an ambulance and did nothing to interfere with or prevent Mr. Reed from obtaining medical treatment.  [Filing No. 80 at 20.]  Defendants further argue, without elaboration, that Ms. Wynn "cannot demonstrate causation."  [Filing No. 80 at 20.]  Finally, Defendants argue that Officer Mercer is entitled to qualified immunity because Ms. Wynn can point to no clearly established law demonstrating that Officer Mercer's conduct amounted to a constitutional violation.  [Filing No. 80 at 20.]

Ms. Wynn does not address the inadequate medical care claim in her response brief.  [*See Filing No. 83*.]

In their reply, Defendants assert that Ms. Wynn did not designate any evidence in support of her adequate medical care claim, and therefore this claim against Officer Mercer "should be dismissed." [Filing No. 91 at 14.]

As an initial matter, the Court interprets Ms. Wynn's denial of medical care claim to be challenging Officer Mercer's alleged failure to seek medical treatment for Mr. Reed following deployment of the ECD, not following the shooting as Defendants' arguments suggest. [*See* Filing No. 75 at 4 (Ms. Wynn's Statement of Claims, stating: "Plaintiff will prove that after shooting Mr. Reed with his [ECD], Officer Mercer became aware that Mr. Reed faced substantial risk of serious harm as he [Mr. Reed] began to convulse while on the ground. Officer Mercer consciously disregarded that risk by not taking reasonable steps to attend to Mr. Reed's medical needs.") (second alteration original).] Regardless, Ms. Wynn did not address the denial of medical care claim at all in her response to Defendants' Motion for Summary Judgment, and therefore any argument she may have had in opposition to that claim is waived. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver."); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of [her] claims."). Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** to the extent that Officer Mercer seeks judgment in his favor of Ms. Wynn's constitutional claim for denial of medical care.

28

### C.  Federal *Monell* Claims Against the City

#### 1.  *Excessive Force*

Defendants do not appear to distinguish between Ms. Wynn's two *Monell* claims, but generally argue that there is no evidence to demonstrate a formal policy, widespread practice, or other instances of misconduct related to Ms. Wynn's claims.  [Filing No. 80 at 22-23.]  They further argue that there is no evidence that any policy, custom, or practice caused the constitutional violations alleged by Ms. Wynn, or that a person with final policymaking authority caused any such violation.  [Filing No. 80 at 23.]

In response, Ms. Wynn argues that Mr. Reed's death "resulted from the unconstitutional custom and practice of IMPD officers who routinely use deadly force to apprehend suspects who are young black men."  [Filing No. 83 at 28.]  Ms. Wynn relies on "IMPD's recently created Dashboard" and "numerous newspaper publications" to demonstrate "the alarming increase in police action shootings involving IMPD officers."  [Filing No. 83 at 29.]  Ms. Wynn contends that the Dashboard shows that between 2015 and September 24, 2021, IMPD "officers have been involved in shootings of at least 50 young black men," resulting in 19 fatalities, and "[i]n almost all instances, IMPD exonerated every single officer involved in these shootings."  [Filing No. 83 at 29.]  According to Ms. Wynn, "[a]lthough these shooting incidents are not specifically endorsed or authorized by law, they are so well-settled and permanent to virtually constitute law," and although the City has policies in place that prohibit the use of excessive force by IMPD officers, these policies are not sufficient to avoid liability because they are routinely disregarded.  [Filing No. 83 at 29-30.]  Ms. Wynn argues that "[e]ven after the shooting death of [Mr.] Reed, IMPD continued shooting at young black men," with seven shootings resulting in two fatalities between January 2021 and September 24, 2021.  [Filing No. 83 at 30.]  Ms. Wynn

maintains that this "pattern of similar incidents and inadequate responses to those incidents . . . demonstrate[s] custom through municipal acquiescence." [Filing No. 83 at 30.]

In reply, Defendants argue that Ms. Wynn has not put forward admissible evidence that would establish the City's liability under *Monell*. [Filing No. 91 at 9.] They contend that the news stories and the IMPD Dashboard relied on by Ms. Wynn are inadmissible hearsay. [Filing No. 91 at 9-10.] They further argue that Ms. Wynn failed to properly cite designated evidence in her response brief, and that any fact set forth by Defendants and not controverted with a specific citation by Ms. Wynn should be deemed admitted. [Filing No. 91 at 10.] According to Defendants, there is no evidence supporting Ms. Wynn's claim that the City's policies regarding the use of force are "routinely disregarded," and even if such a practice existed, Ms. Wynn cannot demonstrate that it was the cause of any constitutional violation. [Filing No. 91 at 10; Filing No. 91 at 13.]

Ms. Wynn filed a surreply, responding to Defendants' assertions that the designated newspaper articles and IMPD Dashboard constitute inadmissible hearsay. [Filing No. 92.] Ms. Wynn notes that "Defendants did not identify or move to strike the alleged objectionable evidence, or even fully develop the grounds for deeming the evidence as hearsay." [Filing No. 92 at 1.] Nevertheless, she argues that the Court should take judicial notice of the Dashboard because: (1) it is published by IMPD, and "IMPD cannot reasonably dispute its own statistics"; (2) it is self-authenticating under Federal Rule of Evidence 902; (3) it is "readily available on IMPD's website as confirmed in the deposition testimony of Deputy Chief Adams"; and (4) it is a governmental publication that is publicly available and directly relevant to the issue of officer-involved shootings in Indianapolis. [Filing No. 90 at 3-4.] Ms. Wynn further argues that the news articles corroborate the information provided on the Dashboard and were submitted to

show "that IMPD routinely used excessive force, including deadly force, during apprehension of suspects without regard to the underlying crimes," that IMPD was deliberately indifferent to this reality, that "IMPD was aware of facts from which inference could be drawn that a substantial risk of serious harm existed whenever IMPD officers engaged with young black men in Indianapolis," and that "IMPD had been aware since 2015 that the number of IMPD police-involved shootings was on the rise and a matter of public interest." [Filing No. 92 at 2-3; Filing No. 92 at 5.] Alternatively, Ms. Wynn argues that the news articles are admissible under the residual hearsay exception in Federal Rule of Evidence 807. [Filing No. 92 at 7.]

    a. Evidentiary Objections

     i. *The IMPD Dashboard*

   Deputy Chief Adams testified that IMPD tracks all officer-involved shootings and publishes the data on the Dashboard on its website. [Filing No. 83-5 at 31.] Ms. Wynn submitted as evidence the spreadsheets posted on the Dashboard, which contain information about officer-involved shootings, such as the date of the incident, the race of the suspect and the involved officer, whether the suspect was shot, whether the shooting was fatal, and the "Prosecutorial Decision." [Filing No. 83-6.] The spreadsheets submitted by Ms. Wynn appear to be the same as those that are available on the officer-involved shootings page of the official website for the City of Indianapolis. *See* https://www.indy.gov/activity/officer-involved-shootings (last visited April 14, 2022).

   Defendants contend that the Dashboard is inadmissible hearsay. Defendants are wrong. "A statement made out of court and offered to prove the truth of the matter asserted is hearsay and is not admissible into evidence." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 583 (7th

Cir. 2019) (citing Fed. R. Evid. 801(c), 802).  However, the Federal Rules of Evidence exclude from the definition of hearsay any statement that "is offered against an opposing party" and:

> (A) was made by the party in an individual or representative capacity;
>
> (B) is one the party manifested that it adopted or believed to be true;
>
> (C) was made by a person whom the party authorized to make a statement on the subject;
>
> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>
> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

The Dashboard is maintained and published by the City on its official website.  It therefore constitutes a statement made by the City (or someone authorized by the City) and the City manifests on its website that it adopts or believes the data to be true.  Accordingly, under Rule 801(d)(2), the Dashboard does not constitute hearsay and therefore is not inadmissible under the rule against hearsay.

In addition, pursuant to Federal Rule of Evidence 201(b), a court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Under this Rule, courts in this Circuit have taken judicial notice of "public records and government documents, including those available from reliable sources on the Internet."  *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 931 n.2 (S.D. Ill. 2006); *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (concluding that the district court abused its discretion in withdrawing its judicial notice of information from National Personnel Record Center's official website); *Laborers' Pension Fund v. Blackmore*

*Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the Federal Deposit Insurance Corporation); *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 763 (N.D. Ill. 2017) (taking judicial notice of a "fact sheet" published on the Environmental Protection Agency's website).

In sum, the Court can and will consider the Dashboard in analyzing the merits of Ms. Wynn's *Monell* claims.

> ii.    *News Articles*

Ms. Wynn designates as evidence the following articles:

- A December 2015 article from the IndyStar, which suggests that the number of fatal shootings by IMPD increased in 2015, relative to previous years, [Filing No. 83-7];

- A May 7, 2020 article from the IndyStar, briefly describing 13 "notable officer-involved shootings by [IMPD] officers in recent years," [Filing No. 83-8];

- Two articles from Fox59, one titled "IMPD reports an increase in officer involved shootings in 2021," and the other titled "'You're done': Video shows IMPD sergeant stomping on handcuffed man's face during Monument Circle arrest," which states that the sergeant involved was "facing termination and criminal charges," [Filing No. 83-9];[11] and

- An October 2021 article from the Huffington Post titled "Police Sergeant Charged After Video Shows Him Kicking Handcuffed Man's Head," [Filing No. 83-10].

News articles are hearsay when offered to prove the truth of their contents. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).  However, the Seventh Circuit has recognized that articles and other unattested hearsay documents may be used as evidence in opposition to summary judgment if "some showing is made (or it is obvious) that they can be replaced by proper evidence at trial" and it has not been feasible to obtain better evidence. *Id.* at 742-43

---

[11] The Court notes that there appear to be formatting issues with these articles and it does not appear that either article is presented in full in Ms. Wynn's filing.  [*See* Filing No. 83-9.]

(concluding that a news article was not admissible under this principle because the party offering it waived any argument that it was not feasible to depose the reporter to attest to the article's contents).  Alternatively, a news article may be admissible at the summary judgment stage "if it fit[s] into one of the exceptions permitting the use of hearsay evidence at trial." *Id*. at 743.

To the extent that Ms. Wynn relies upon any of the news articles to prove the truth of their contents—*i.e.*, that officer-involved shootings are on the rise in Indianapolis, or that any of the incidents of excessive force described in the articles actually occurred or occurred in the manner that the articles describe—the articles are inadmissible hearsay.  Ms. Wynn has not shown—or even argued—that it was not feasible to obtain better evidence or that the articles can be replaced by proper evidence at trial.  Ms. Wynn makes several arguments that the articles are admissible, but none of these arguments are persuasive.

First, Ms. Wynn argues that "newspaper articles are not inherently inadmissible because they are newspapers," citing the Court's decision in *Martin v. City of Indianapolis*, 982 F. Supp. 625 (S.D. Ind. 1997).  In that case, the plaintiff, Mr. Martin, asserted a claim against the City under the Visual Artists Rights Act ("VARA"), arguing that the City violated VARA by destroying a sculpture he created.  *See Martin*, 982 F. Supp. at 629-30.  The City moved for summary judgment, arguing in relevant part that Mr. Martin had failed to designate admissible evidence showing that the sculpture was a "work of recognized stature," as required to prove his VARA claim.  *Id*. at 630.  Specifically, the City argued that Mr. Martin's exhibits, which included "newspaper and magazine articles as well as letters and awards regarding [Mr.] Martin's artwork," were inadmissible hearsay and could not be considered by the Court at summary judgment.  *Id*.  The Court rejected the City's argument, stating:

> The statements contained within the proffered newspaper and magazine articles and letters are offered by Martin to show that respected members of the art

34

> community and members of the public at large consider Martin's work to be
> socially valuable and to have artistic merit, and to show the newsworthiness of
> [the sculpture] and Martin's work.   These statements are offered by Martin to
> show that the declarants *said* them, not that the statements are, in fact, true.   The
> critical element of "recognized stature" involves community opinion about
> Martin's work, not a determination that Martin's work is inherently meritorious.
> The statements contained within the exhibits show how art critics and the public
> viewed Martin's work, particularly [the sculpture], and show that the sculpture
> was a matter worth reporting to the public.   Therefore, the statements contained
> within these challenged exhibits are not hearsay because they are not being
> offered for the truth of the matters asserted therein.   Accordingly, the City's
> objection to the admission of Martin's exhibits as inadmissible hearsay is *denied*.

*Id*. at 630-31 (emphasis original).   The Seventh Circuit affirmed, agreeing that the articles and

letters were admissible for the "unique and limited purpose" of showing that the sculpture "had

not gone unnoticed" by art critics and the public.   *Martin v. City of Indianapolis*, 192 F.3d 608,

613 (7th Cir. 1999).

*Martin* is distinguishable from this case.   While Ms. Wynn may be correct that newspaper

articles are not *per se* inadmissible simply because they are newspaper articles, that does not

change the fact that the newspaper articles at issue here are inadmissible because they are

hearsay.   The articles in *Martin* were not hearsay because they were being offered to prove

something other than the truth of their contents—*i.e.*, that the public was aware of the

sculpture—and that showing was a required element of Mr. Martin's claim.   As noted above, Ms.

Wynn is offering the articles to prove the truth of their contents—that police shootings were on

the rise and that officers used excessive force in the cases being reported on.   The articles are not

admissible for this purpose.

Ms. Wynn also suggests that the articles are admissible because they corroborate or

mirror the information posted on IMPD's Dashboard.   [*See* Filing No. 92 at 5.]   That may be true,

but it does not change the fact that the articles are hearsay.   If anything, that is a reason not to

consider the evidence, as it is merely cumulative.   *See United States v. Boyd*, 55 F.3d 239, 246

(7th Cir. 1995) ("Merely cumulative evidence is excludable, as having little probative value . . . .").

In addition, Ms. Wynn points to statements contained within the articles that are attributed to IMPD officials, suggesting that those statements are admissible. [*See* Filing No. 92 at 5.]  However, even if the statements made by IMPD are not hearsay, they are still contained within an article that itself is hearsay, and therefore in order for them to be admissible Ms. Wynn must demonstrate that a hearsay exception applies to the article.  *See Halloway v. Milwaukee Cty.*, 180 F.3d 820, 825 (7th Cir. 1999) (acknowledging that under Fed. R. Evid. 805, in order for defendants' statements recited within the affidavit of a non-party to be admissible, the party offering the statements must show that the defendants' statements are admissible and that the affidavit itself is admissible).

Further, Ms. Wynn argues that the articles are admissible "to show that the IMPD had been aware since 2015 that the number of IMPD police-involved shootings was on the rise and a matter of public interest."  [Filing No. 92 at 5.]  However, in order to show that these articles put IMPD (or the City) on notice of the issues described in the articles, Ms. Wynn would have to show that IMPD or the City was aware of these articles, which she has not done.  In any event, given that the Dashboard contains information about the number of officer-involved shootings, the news articles are not necessary to establish that IMPD was aware of these incidents and any trends that can be seen in the data relating to officer-involved shootings.

Finally, Ms. Wynn contends that the articles are admissible under the residual hearsay exception in Rule 807.  [Filing No. 92 at 7.]  That Rule provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception" if "(1) the statement is supported by sufficient guarantees of trustworthiness--after

considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Ms. Wynn argues that Rule 807 applies because "[t]hese articles concerned matters of local interest and the facts in question are of such a public nature that it would be generally known throughout the community." [Filing No. 92 at 7.] This argument is unavailing. To the extent that Ms. Wynn relies on the articles to show an increase in officer-involved shootings, she has not shown that the articles are more probative of this point than any other evidence that she could obtain through reasonable means. In fact, she did obtain and submit IMPD's own data on this issue in the form of the Dashboard, which is more probative than a newspaper article regarding the number of police action shootings. To the extent that Ms. Wynn relies on the articles to establish the facts of any particular incident described therein, she has not explained why she could not obtain more probative, non-hearsay evidence. For example, two of the articles concern an incident in which an IMPD officer allegedly kicked a man in the head and was later disciplined for those actions. Ms. Wynn does not assert that she could not obtain more probative, non-hearsay evidence about that incident from Defendants during discovery in this case. Rule 807 therefore does not render the articles admissible.

In sum, the newspaper articles submitted at Filing No. 83-7, Filing No. 83-8, Filing No. 83-9, and Filing No. 83-10 are hearsay and are inadmissible. The Court therefore will not consider them in analyzing the merits of Ms. Wynn's *Monell* claims against the City.

### b.  Merits of the Excessive Force Policy Claim

"*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct." *J.K.J. v. Polk Cty.*, 960

F.3d 367, 377 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (2021).   A plaintiff asserting a

§ 1983 claim against a municipality under *Monell* "must prove that the constitutional violation

was caused by a governmental 'policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy.'" *First Midwest Bank v. City

of Chicago*, 988 F.3d 978, 986 (7th Cir.), *cert. denied*, 142 S. Ct. 389 (2021) (quoting *Monell*,

436 U.S. at 694).   In order to succeed on a *Monell* claim, the plaintiff must first demonstrate a

deprivation of a constitutional right.  *First Midwest Bank*, 988 F.3d at 987.   Then, the plaintiff

must prove three elements: (1) a policy or custom; (2) "municipal fault"; and (3) "'moving force'

causation."  *Id*.

A *Monell* plaintiff may satisfy the policy or custom element by proving: "'(1) an express

policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so

permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the

constitutional injury was caused by a person with final policymaking authority.'"  *Id*. at 986

(quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)); *see also J.K.J.*, 960 F.3d 367,

377 ("A municipal action can take the form of an express policy (embodied, for example, in a

policy statement, regulation, or decision officially adopted by municipal decisionmakers), an

informal but established municipal custom, or even the action of a policymaker authorized to act

for the municipality.").

The Seventh Circuit has "not adopt[ed] any bright-line rules defining a widespread

custom or practice," and "there is no clear consensus as to how frequently such conduct must

occur to impose *Monell* liability, except that it must be more than one instance, or even three."

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (internal quotations and

citations omitted).  "But the plaintiff must demonstrate that there is a policy at issue rather than a

38

random event." *Id.* "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that [the Supreme Court has] held cannot support municipal liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020) (internal quotations and citation omitted).

Regarding municipal fault, where the plaintiff asserts that a municipality has not directly engaged in a constitutional violation but instead has caused an employee to do so, "a rigorous standard of culpability applies to ensure that the municipality is not held liable solely for the actions of its employee." *First Midwest Bank*, 988 F.3d at 986-87 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)) (internal quotation marks and alterations omitted). In this situation, the plaintiff must prove that the municipality's action was taken with "deliberate indifference" to the plaintiff's constitutional rights. *First Midwest Bank*, 988 F.3d at 987 (citation omitted). "This is a high bar," and "[n]egligence or even gross negligence on the part of the municipality is not enough." *Id.* (citation omitted). Instead, "[a] plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* (citation omitted).

As for causation, the "plaintiff must prove that the municipality's action was the 'moving force' behind the federal-rights violation." *Id.* (citation omitted). "To satisfy the standard, the

plaintiff must show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *Id.* (citation omitted).

For reasons explained above, the facts underlying the shooting of Mr. Reed remain in dispute and therefore the Court cannot determine at this time whether Mr. Reed's Fourth Amendment rights were violated. Nevertheless, the Court still must consider whether— assuming a constitutional violation can be shown—the City may be held liable for that violation under *Monell*. Accordingly, the Court will assume that a reasonable factfinder could find the deprivation of a constitutional right, and will consider whether Ms. Wynn has satisfied the other elements of her *Monell* claims such that those claims may proceed to trial.

In this case, Ms. Wynn asserts that Mr. Reed's death "resulted from the unconstitutional custom and practice of IMPD officers who routinely use deadly force to apprehend suspects who are young black men." [Filing No. 83 at 28.] However, not every use of deadly force amounts to a constitutional violation. It is an unfortunate reality that deadly force is necessary and reasonable in some circumstances. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."). So, the relevant question is not whether IMPD officers routinely use deadly force against young Black men, it is whether IMPD officers routinely violate the Fourth Amendment by *unreasonably* using deadly force against young Black men.

Ms. Wynn's claim that IMPD or the City has a widespread practice of using excessive, deadly force against young Black males fails for lack of evidence. The Dashboard provides basic data on office-involved shootings, but does not provide sufficient information regarding the circumstances of each shooting such that the Court or a factfinder could determine whether

excessive force was used in any particular situation.  A person can look through the Dashboard to determine how many young Black men have been shot by IMPD officers since 2015, how many of those shootings resulted in death, how many shootings were determined to comply with department policy, how many were deemed "justified" by prosecutors or resulted in charges against the involved officer, and so on, but there is no way to know from looking at the Dashboard alone how many of those incidents amount to constitutional violations for purposes of determining whether a pattern of constitutional violations exists.  In analyzing any particular use of force by police, the surrounding facts and circumstances are critical, and the Dashboard simply does not provide all of the information required to determine whether the identified officer-involved shootings involved the use of excessive force.[12]   Neither does any other admissible evidence provided by Ms. Wynn.[13]

Ms. Wynn also asserts that, in addition to a pattern or practice of shooting young Black men, the City or IMPD demonstrated a pattern or practice of "inadequate responses to those incidents."   [Filing No. 83 at 30.]   But again, Ms. Wynn failed to present any evidence demonstrating such a pattern.  The Dashboard does not provide any information concerning

---

[12] To illustrate this point, the Court notes that the Dashboard entry concerning the shooting of Mr. Reed lists only the following information: Incident Date: 5/6/2020; Case Report: IP200044019; CAD: IP20050600001611; Call Type: Vehicle Pursuit; Street Address: 6200 N Michigan Rd; City: Indianapolis; Postal Code: 46268; District: Northwest; Officer Name: D. Mercer; Officer Race: Black; Officer Gender: Male; Officer Age: 26; Officer Tenure: 4 Years; Suspect Name: Dreasjon Reed; Suspect Race: Black; Suspect Gender: Male; Suspect Age: 21; Suspect Shot: Yes; Fatal: Yes; Suspect Weapon: Handgun; UOF Within Policy: Yes; Case Status: Closed; Prosecutorial Decision: Justified; Firearms Review Board: In Compliance; FRB Date: 1/11/2020; Further Situational Training Recommendation: Pending.  [Filing No. 83-6 at 12-13.]

[13] Importantly, the result would be the same even if the Court had considered the newspaper articles submitted by Ms. Wynn.  Much like the Dashboard, the articles do not contain sufficient information from which a factfinder could conclude that the incidents described in the articles demonstrate a pattern of excessive force.  And the fact that the number of officer-involved shootings has increased says nothing about the constitutionality of any of the shootings.

IMPD's response to any particular incident, beyond one- or two-word descriptions of whether the use of force was deemed to comply with policy, whether a prosecutor believed charges were appropriate, and whether the firearms review board reviewed the case. [*See* Filing No. 83-6.] As such, the Dashboard does not provide a basis from which a factfinder could conclude that IMPD's response was inadequate.[14]

Put simply, at the summary judgment stage, "a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021). "[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004). Ms. Wynn was required to provide evidence from which a factfinder could conclude that IMPD has a widespread pattern or practice of unconstitutionally shooting young Black men, that the City was deliberately indifferent to that pattern, and that the City's inaction caused a violation of Mr. Reed's constitutional rights. But there is nothing in the current record from which a reasonable finder of fact could draw those conclusions. Accordingly, Ms. Wynn's claim fails as a matter of law, and Defendants' Motion for Summary Judgment is **GRANTED** as to the *Monell* claim relating to the use of excessive force.

### 2. *Failure to Train*

Again, Defendants generally argue that there is no evidence to demonstrate a formal policy, widespread practice, or other instances of misconduct related to Ms. Wynn's claim related to IMPD's training of its officers. [Filing No. 80 at 22-23.] They further argue that there is no

---

[14] Ms. Wynn also asserts that IMPD "discarded [its] bodycam program," and suggests that this action evidences a policy of not appropriately addressing instances of excessive force. [*See* Filing No. 83 at 29.] However, Ms. Wynn does not cite to any evidence in support of this, and therefore the Court need not address it. *See Grant*, 870 F.3d at 572-73; Fed. R. Civ. P. 56(c)(3), (e)(2); S.D. Ind. L.R. 56-1(h).

evidence that any policy, custom, or practice caused the constitutional violations alleged by Ms. Wynn, or that a person with final policymaking authority caused any such violation. [Filing No. 80 at 23.] In addition, Defendants contend that IMPD "routinely trains its officers on the use of force" and instructs them to give a warning before using deadly force where feasible. [Filing No. 80 at 23 (referencing the Use of Force Policy).]

Ms. Wynn contends that Mr. Reed's death "resulted from the failure of IMPD policy makers to implement training, discipline, or supervisory protocols to prevent [the use of excessive force against Black, male suspects] with deliberate indifference to the demonstrated probability that their failure would result in continued constitutional violations." [Filing No. 83 at 28.] Ms. Wynn argues that "the City was deliberately indifferent to [Mr.] Reed's constitutional rights when it failed to train its officers, especially Officer Mercer, in light of the evidence of Officer Mercer's frequent and excessive deployment of his taser against civilians." [Filing No. 83 at 30.] According to Ms. Wynn, IMPD knew that its officers might confront suspects who might resist arrest, the officers had a history of mishandling these encounters, and "its officers' wrong choices have frequently resulted in the violation of constitutional rights." [Filing No. 83 at 31.] Ms. Wynn contends that the City "has produced no evidence of training its officers regarding the discharge of tasers or firearms" and that "[t]here is a causal link between this municipal policy and the deprivation of [Mr.] Reed's constitutional rights." [Filing No. 83 at 31.]

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). A plaintiff may demonstrate deliberate indifference by establishing that the municipality either: (1) "fails to train its employees to handle a recurring situation that presents an obvious potential

for a constitutional violation and this failure to train results in a constitutional violation"; or (2) "fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted).

Ms. Wynn appears to argue that the City is deliberately indifferent in both of these ways. To the extent that she asserts that the City has failed to provide further training after learning of a pattern of constitutional violations, her claim fails for lack of evidence just as her excessive force *Monell* claim did. Although Ms. Wynn asserts that Officer Mercer has a history of frequently and excessively deploying his taser against civilians, she does not point to any evidence demonstrating such a history. Officer Mercer testified that he has deployed his taser on several occasions, [*see* Filing No. 80-9 at 14-17], but there is no evidence in the record from which a factfinder could conclude that his use of a taser was excessive or unreasonable in those instances. Similarly, and as explained above, Ms. Wynn has not submitted any evidence demonstrating a pattern of the use of excessive force by other officers, and therefore has not provided a basis from which a reasonable factfinder could conclude that the City was deliberately indifferent to such a pattern. Accordingly, she cannot maintain a failure to train claim premised on the City's purported deliberate indifference to a pattern of excessive force. *See Dye v. Wargo*, 253 F.3d 296, 299 (7th Cir. 2001) ("Proof of failure to train officers could be used to demonstrate that the municipality approves (hence has a policy of) improper conduct that training could extirpate. Such a claim in a case like this would depend on establishing that the City's policymakers knew that the police were using objectively unreasonable force in apprehending suspects, yet did nothing to solve the problem. [Plaintiff] has not offered any evidence that use of excessive force is common in [the City], indeed has not produced evidence of even one prior incident. Thus the

City cannot be held liable on the theory that lack of more extensive training for [officers] evinces a policy of using constitutionally improper force.") (citations omitted).

Absent a pattern of constitutional violations, Ms. Wynn must establish the City's deliberate indifference by showing that a constitutional violation occurred and that the violation was the result of the City's failure to train its officers to handle a recurring situation that presents an obvious potential for a constitutional violation. *See Dunn*, 347 F.3d at 646; *see also Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021) ("Notably, failure-to-train liability does not require proof of widespread constitutional violations before that failure becomes actionable; a single violation can suffice where a violation occurs and the plaintiff asserts a recurring, obvious risk."). Again, the Court will assume that a reasonable factfinder could find that a constitutional violation has been established, and will focus its inquiry on whether any such violation was the result of the City's failure to train officers to handle a recurring situation that presents an obvious risk of constitutional harm.

The Supreme Court discussed this type of deliberate indifference in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). There, the Court acknowledged that "it may happen that in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," stating:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 310, 310 n.10 (internal citations omitted). The Supreme Court subsequently expanded on this notion of liability based on obviousness, writing:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409-10 (1997). "Put another way, a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380.

In considering municipal liability based on the failure to train, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91. Similarly, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick v. Thompson*, 563 U.S. 51, 68 (2011).

Ms. Wynn's claim that the City demonstrated deliberate indifference to an obvious risk of constitutional harm also fails for lack of evidence. As an initial matter, Ms. Wynn focuses only on Officer Mercer's training, without regard to whether that training was consistent with

46

IMPD's overall program of training its officers.  *See Canton*, 489 U.S. at 390.  However, even assuming that Officer Mercer's training experience is typical, Ms. Wynn has not presented any evidence of a deficiency in the training that can be characterized as a deliberate choice by the City.

Ms. Wynn contends that "Officer Mercer himself admitted in his deposition that since completing the academy, he has not received training in connection with his work." [Filing No. 83 at 30.]  This contention is not supported by any citation to the record, and in any event is a mischaracterization of Officer Mercer's testimony.  Officer Mercer testified that he completed Basic Academy Training, then field training, but he did not complete additional *field training* thereafter.  [*See* Filing No. 83-11 at 9-10.]  Officer Mercer further stated that, outside of Basic Academy Training and field training, he did not complete any additional training specifically related to foot pursuits.  [Filing No. 83-11 at 10-11.]  He has, however, received training on multiple subjects since completing field training, as evidenced by his training record.  [*See* Filing No. 80-4 at 3-5.]  This included training on vehicle pursuits and the use of force.  [*See* Filing No. 80-4 at 3-5.]

Ms. Wynn also contends that the City should have trained Officer Mercer "in light of the evidence of [his] frequent and excessive deployment of his taser against civilians." [Filing No. 83 at 30.]  But again, there is no evidence in the record from which a reasonable jury could find that Officer Mercer's previous uses of his taser were excessive in the constitutional sense.

The undisputed evidence demonstrates that Officer Mercer received training either during Basic Academy Training, during the field training period, thereafter, or during more than one of these periods on the topics relevant to this case, including vehicle pursuits, foot pursuits, body leverage, tasers, firearms, and the use of force.  [*See* Filing No. 80-4 at 3-5; Filing No. 80-9 at

10-13; Filing No. 80-9 at 23.]  There are official written policies in place instructing officers on how to conduct vehicle pursuits and how and when to properly use reasonable force.  Ms. Wynn develops no argument and presents no evidence concerning how any of this training was inadequate or left Officer Mercer unequipped to handle his encounter with Mr. Reed.  Aside from generally asserting that IMPD's training protocols are inadequate, she does not present any evidence of a deficiency in those protocols or point to any additional or different training that the City should have provided.  Her contention that "[t]he city has produced no evidence of training its officers regarding the discharge of tasers or firearms" is flatly contradicted by the record but also ignores the reality that Ms. Wynn bears the burden of providing evidence from which a reasonable jury could conclude that the City, through some conscious choice or willful inaction, was deliberately indifferent to an obvious risk.

Although the Supreme Court in *Canton* recognized that it is obvious that a city must train its officers on the use of deadly force if it arms those officers, this case is different from the situation hypothesized in *Canton*.  Here, the evidence shows that the City does train its officers on the use of force, firearms, and tasers and on how to handle vehicle and foot pursuits.  Ms. Wynn has put forth no evidence from which a reasonable jury could find program-wide deficiencies in IMPD's training protocols that lead to any of the harms inflicted upon Mr. Reed.  Her suggestion that more training could have resulted in a different outcome on May 6, 2020 is not evidence, and is simply not sufficient as a matter of law to support municipal liability.  *See Connick*, 563 U.S. at 68.  Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** to the extent that the City seeks judgment in its favor on the inadequate training claim.

### D.  State Law Claims Against Chief Taylor and Deputy Chief Adams

Defendants argue that under the Indiana Tort Claims Act ("ITCA"), Chief Taylor and Deputy Chief Adams are immune from personal liability for Ms. Wynn's claims for NIED and wrongful death because they were acting within the scope of their employment when the events underlying this lawsuit took place.[15] [Filing No. 80 at 23-25.]  According to Defendants, even if Ms. Wynn could prove that Chief Taylor's and Deputy Chief Adams' actions were malicious, willful, or wanton, "the ITCA requires that all state-law claims related to their actions be pursued against [their] employer – the City of Indianapolis."  [Filing No. 80 at 24.]

In response, Ms. Wynn argues that Chief Taylor and Deputy Chief Adams are not immune under the ITCA because the foundation of the claims against them is the excessive use of force resulting in Mr. Reed's death, and the ITCA does not immunize the use of excessive force.  [Filing No. 83 at 32-33.]

In reply, Defendants maintain that the ITCA bars a lawsuit against a governmental employee acting within the scope of his employment.  [Filing No. 91 at 14-15.]  Defendants further contend that the ITCA also immunizes governmental entities and employees from liability where a loss results from the adoption or enforcement of a law.  [Filing No. 91 at 14-16.] And while Defendants recognize that the law enforcement immunity provision of the ITCA does not shield officers from liability for excessive or unreasonable force, they contend that this exception is irrelevant here, because neither Chief Taylor nor Deputy Chief Adams are alleged to

---

[15] Defendants also argued that Officer Mercer is immune from personal liability for the same reasons.  [Filing No. 80 at 23]  However, because Defendants withdrew their arguments in favor of summary judgment on the battery claim against Officer Mercer, and because that is the only state law claim remaining against Officer Mercer, the Court does not consider immunity in relation to Officer Mercer.

have been involved in any conduct involving the use of force that caused injury to Mr. Reed. [Filing No. 91 at 15-16.]

The ITCA, Ind. Code § 34-13-3-1 *et. seq.*, governs state law tort claims against governmental entities and public employees. *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003). "Among other things the statute provides substantial immunity for conduct within the scope of the employee's employment." *Id.* Specifically, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the [ITCA], there is no remedy against the individual employee so long as he was acting within the scope of his employment.").

In addition, the law enforcement immunity provision of the ITCA provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8)(A). In determining whether this provision immunizes a police officer's conduct, a court must determine whether: (1) the officer was acting within the scope of his employment when the injury to plaintiff occurred; and (2) whether the officer was engaged in the enforcement of a law at that time. *Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) (citing *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010)).

The Indiana Supreme Court has recognized, however, that police conduct that breaches an independent statutory duty is not immunized by the law enforcement provision of the ITCA. *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (discussing *Patrick v. Miresso*, 848 N.E.2d 1083 (Ind. 2006)). For example, because Ind. Code § 35-41-3-3(b) limits police officers to using

50

only force that is reasonable, an officer's conduct will not be shielded from liability if he uses excessive or unreasonable force. *Wilson*, 929 N.E.2d at 203-04. To determine whether a claim is barred by law enforcement immunity, courts must look to the conduct forming the foundation of the claim, rather than relying on the legal theory upon which the claim is based. *See Bowens v. City of Indianapolis*, 2014 WL 4680662, at *7 (S.D. Ind. Sept. 19, 2014) ("[I]mmunities afforded governmental defendants focus not on legal theories but on *conduct*. The court must therefore focus on whether the alleged *conduct* is immunized under the law enforcement immunity provision at Ind. Code § 34-13-3-3(8), not whether the immunity applies to a particular legal theory." (emphasis in original)). If conduct constituting excessive force is the foundation of the tort claim, the claim is not barred by the law enforcement immunity provision. *See id.* ("Because the alleged excessive force is the foundation of [plaintiff's] emotional distress claims and because excessive force is not immunized conduct, the court rejects the City's argument that it is immunized by the [ITCA] against the claims for negligent and intentional infliction of emotional distress."); *Todero v. Blackwell*, 383 F. Supp. 3d 826, 842 (S.D. Ind. 2019) ("Similarly here, [plaintiff] alleges that in using excessive force, [the officers] intentionally inflicted emotional distress, so section 34-13-3-3(8) immunity does not apply.").

As Ms. Wynn acknowledges in her response brief, Defendants' immunity argument is "not new," and the issue was raised at the motion to dismiss stage. [Filing No. 83 at 31.] At that time, the Court refused to dismiss Ms. Wynn's claims against Chief Taylor and Deputy Chief Adams on immunity grounds, given that Ms. Wynn had alleged in her Complaint that the Chief Taylor and Deputy Chief Adams were acting within the scope of their employment at all relevant times, but Defendants had denied that allegation in their Answer. [Filing No. 31 at 15-16.] The Court clarified that its ruling was without prejudice to Defendants presenting a properly

supported immunity defense at a later stage, expressly concluding that "the question of whether Chief Taylor and Deputy Chief Adams were acting within the scope of their employment—and, by extension, whether they are immunized from personal liability for the state law claims—should be reserved for a later stage in the litigation, when the Court will have the benefit of factual development." [Filing No. 31 at 16.]  While Ms. Wynn acknowledges this earlier ruling in her briefing, she makes no argument relating to the key issue, which is whether Chief Taylor and Deputy Chief Adams were acting within the scope of their employment on May 6, 2020. [*See* Filing No. 83 at 31-33.]

Conduct is within the scope of an employee's employment if it is "of the same general nature as that authorized, or incidental to the conduct authorized," by the employer.  *Bushong*, 790 N.E.2d at 473 (internal quotations and citations omitted).  "An act is incidental to authorized conduct when it is subordinate to or pertinent to an act which the servant is employed to perform, or when it is done to an appreciable extent, to further his employer's business."  *Id.* (internal quotations and citations omitted).  "Even criminal acts may be considered as being within the scope of employment if 'the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope.'"  *Id.* (quoting *Stropes v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989)).  Whether an employee was acting within the scope of his employment is ordinarily a question of fact, but "under certain circumstances the question may be determined as a matter of law."  *Bushong*, 790 N.E.2d at 473-74 (affirming the trial court's conclusion at summary judgment that defendant was acting within the scope of his employment, given that the facts were not disputed).

Ms. Wynn does not argue that Chief Taylor and Deputy Chief Adams were not acting within the scope of their employment at all relevant times, and the undisputed facts show that

they were.  Deputy Chief Adams was driving in an unmarked police vehicle when he attempted to pull Mr. Reed over for committing a traffic violation, and a pursuit ensued when Mr. Reed failed to stop.  Chief Taylor saw this occur and joined the pursuit, while announcing their movements over the official police radio.  There can be no real dispute that all of this conduct is authorized by and incidental to Chief Taylor's and Deputy Chief Adams' employment with IMPD.  [*See* Filing No. 80-4 at 17 (the Vehicle Pursuit Policy, which states: "The authority of a law enforcement officer to engage in pursuit is inherent in the officer's duty to apprehend persons who have committed, or are committing a law violation.  The authority to pursue law violators provides [IMPD] an opportunity to deter crime and protect the citizens of Indianapolis and Marion County.").]

Ms. Wynn focuses her arguments on the fact that acts of excessive force are not immunized under the law enforcement provision of the ITCA.  While this is a correct recitation of the law, it is irrelevant to whether Chief Taylor and Deputy Chief Adams are personally immune from suit under Indiana Code § 34-13-3-5(b).  Moreover, neither Chief Taylor nor Deputy Chief Adams are alleged to have committed any acts that constitute the use of force, much less excessive force.  Rather, the undisputed evidence shows that neither Chief Taylor nor Deputy Chief Adams were present at the scene when Officer Mercer encountered, tased, or shot Mr. Reed.  The fact that Chief Taylor and Deputy Chief Adams may have set in motion a series of events that ultimately culminated in another person's use of force is not dispositive, because the conduct underlying the claims against Chief Taylor and Deputy Chief Adams is not directly related to the injury cause by ultimate acts of force.

In sum, because Chief Taylor and Deputy Chief Adams are immune from personal liability under the ITCA, Defendants' Motion for Summary Judgment is **GRANTED** to the

extent that Defendants are entitled to judgment in their favor on Ms. Wynn's claims for wrongful death and NIED against Chief Taylor and Deputy Chief Adams.

### E.  State Law Wrongful Death Claim Against the City

Defendants argue that "Indiana's wrongful death statutes do not define or create a separate tort, they are merely a mechanism or vehicle by which a decedent's estate can recover damages that the decedent could have recovered personally if he survived [the] wrongful act." [Filing No. 80 at 25.]  Accordingly, they argue, Ms. Wynn's "wrongful-death claim is not an actual legal claim," and therefore the City is entitled to summary judgment.  [Filing No. 80 at 25.]

In response, Ms. Wynn argues that Indiana's wrongful death statutes permit a claim by a personal representative of a decedent whose death was caused by the wrongful act or omission of another.  [Filing No. 83 at 34.]  Ms. Wynn asserts that "Defendants have not argued that [she] is unqualified to bring a wrongful death suit against them," and that "Defendants' contention, if accepted, will essentially render the Indiana wrongful death statute a nullity." [Filing No. 83 at 34.]

In reply, Defendants assert that Ms. Wynn "misunderstands [their] argument for their entitlement to summary judgment on the wrongful-death claim" and consequently "has failed to demonstrate or designate evidence to create a factual dispute on this claim." [Filing No. 91 at 17.]  Defendants argue that Indiana's wrongful death statutes are "akin to 42 U.S.C. § 1983" in that "[n]either has any substantive rights" and "[b]oth are merely mechanisms to enforce rights or pursue litigation." [Filing No. 91 at 17.]  According to Defendants, "wrongful death isn't a claim in and of itself," but instead Ms. Wynn may "employ one of Indiana's wrongful death statutes as a means to assert a negligence or other state-law claim." [Filing No. 91 at 17.]  Defendants

contend that the wrongful death statute "just specifies categories of damages that certain individuals are entitled to if a plaintiff prevails on the underlying substantive claims." [Filing No. 91 at 17.]

Indiana's general wrongful death statute states that "[w]hen the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she, as the case may be, lived, against the latter for an injury for the same act or omission." Ind. Code § 34-23-1-1. The statute further provides that only the personal representative may recover damages, and specifies what categories of damages may be recovered. Ind. Code § 34-23-1-2.

The only authority that Defendants cite in support of their position that wrongful death is not a freestanding cause of action is *Thompson v. City of Indianapolis*, 2017 WL 4155224 (S.D. Ind. Sept. 19, 2017), in which the Court denied the defendants' motion to reconsider its earlier dismissal of a wrongful death claim under Indiana law. Defendants cite this opinion for the proposition that "Indiana's wrongful death statutes do not create separate torts independent of other state-law claims." [Filing No. 80 at 25.] But *Thompson* says nothing of the sort.[16] And the Court has not located any authority supporting Defendants' argument.

---

[16] In *Thompson*, the Court had previously dismissed the plaintiff's state law wrongful death claim, concluding that the Court lacked subject matter jurisdiction over the claim based on Indiana's Medical Malpractice Act, which requires plaintiffs to first present state law medical negligence claims to a medical review panel before bringing the claims to court. *Thompson*, 2017 WL 4155224, at *3. The Court refused to dismiss the plaintiff's remaining state law claims on the same basis, and some of the defendants asked the Court to reconsider that conclusion, arguing that the remaining state law claims also fell within the purview of the Medical Malpractice Act. *See id.* Setting aside the fact that *Thompson* does not contain a statement of the proposition for which Defendants cite it, *Thompson* is also readily distinguishable because it involved a medic and a hospital corporation who were alleged to have caused the death of an individual during the course of providing medical care incident to the individual's arrest. Mr. Reed's death is not alleged to have been caused by medical malpractice, and therefore does not implicate the Medical Malpractice Act.

Indeed, Indiana courts regularly recognize wrongful death as a legitimate cause of action. *See, e.g.*, *Ellenwine v. Fairley*, 846 N.E.2d 657, 662 (Ind. 2006) ("What is clear and obvious is that a negligence claim and a wrongful death claim are two wholly separate causes of actions which must be brought by different parties and which, for the most part, provide damages for separate types of injuries."); *Reeder v. Harper*, 788 N.E.2d 1236, 1242 (Ind. 2003) ("[T]he Wrongful Death Statute provides a cause of action when 'the death of one is caused by the wrongful act or omission of another[.]'  The purpose of the Wrongful Death Statute is not to compensate for the injury to the decedent but rather to create a cause of action to provide a means by which the decedent's survivors may be compensated for the loss sustained by reason of the death.") (internal citations omitted); *see also Warrum v. United States*, 427 F.3d 1048, 1051-52 (7th Cir. 2005) (observing that "Indiana treats a wrongful death claim as substantively distinct from the underlying personal injury claim" and that "Indiana law regards a wrongful death claim as independent of a personal injury claim that might have been possessed by the decedent before death").

In sum, Defendants' argument is wholly unsupported by legal authority, and their Motion for Summary Judgment is **DENIED** to the extent Defendants seek judgment in their favor on Ms. Wynn's wrongful death claim.

## IV.
### CONCLUSION

For the foregoing reasons, Defendants Motion for Summary Judgment, [79], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- The Motion is **DENIED AS MOOT** to the extent that Defendants have withdrawn their request for summary judgment as to the following claims:

- o   the Fourth Amendment excessive force claim against Officer Mercer related to the shooting;

- o   the state law battery claim against Officer Mercer;

- o   the state law battery claim against the City; and

- o   the state law NIED claim against the City;

- The Motion is **GRANTED** to the extent that Defendants are entitled to judgment in their favor on the following claims:

  - o   the Fourth Amendment excessive force claim against Officer Mercer related to the use of an ECD;

  - o   the federal inadequate medical care claim against Officer Mercer;

  - o   the *Monell* claim against the City concerning an alleged policy of excessive force;

  - o   the *Monell* claim against the City concerning an alleged failure to train;

  - o   the state law wrongful death and NIED claims against Chief Taylor and Deputy Chief Adams;

- The Motion is **DENIED** to the extent that Defendants are not entitled to judgment in their favor on the state law wrongful death claim against the City.

The following claims remain pending:

- the Fourth Amendment excessive force claim against Officer Mercer related to the shooting;

- the state law battery claim against Officer Mercer;

- the state law battery claim against the City;

- the state law NIED claim against the City; and

- The state law wrongful death claim against the City.

No partial final judgment shall issue at this time.    The parties are reminded that this case is set for a Final Pretrial Conference on May 26, 2022, at 2:00 p.m., and for trial on June 20, 2022. The parties are encouraged to work with the Magistrate Judge to reach a resolution of this case short of trial.

Date: 4/14/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**